# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 02-3942

_____

| | | |
|---|---|---|
| Benjamin Agada, | * | |
| | * | |
| Petitioner, | * | |
| | * | Petition for Review of an Order of |
| v. | * | the Board of Immigration Appeals. |
| | * | |
| John Ashcroft, Attorney General of | * | |
| the United States, | * | [PUBLISHED] |
| | * | |
| Respondent. | * | |

_____

Submitted: March 11, 2004
Filed: May 14, 2004 (corrected 5/18/04)

_____

Before WOLLMAN, FAGG, and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

Benjamin Agada, a citizen of Nigeria who intentionally overstayed his visitor's visa, petitions this court for review of an order entered by the Board of Immigration Appeals (BIA), dismissing his appeal from an Immigration Judge's (IJ) decision denying his requests for asylum, withholding of removal, or relief under Section 3 of the Convention Against Torture. Agada argues that the IJ and the BIA failed to analyze his case as one involving a "pattern and practice" of persecution of a group with which Agada identifies, namely journalists. We deny the petition.

Agada is a 44-year-old native and citizen of Nigeria who worked as a radio journalist for the Federal Radio Corporation of Nigeria (Radio Nigeria) beginning in 1978. He was also an officer of the Nigerian Union of Journalists, a group which often voiced its opposition to the government. In 1985, while working as a Senior Producer for Radio Nigeria, Agada reported that the Nigerian government had secretly enrolled Nigeria in the Organization of Islamic States (OIC), which required that Islam be declared as the official religion of the nation. Shortly after Agada's reporting on the OIC issue, he was demoted to working in the library at Radio Nigeria, but was never fired. He was accused of embezzling from Radio Nigeria and questioned on the charges, but no further action was taken against him. Agada continued to work at Radio Nigeria until he came to the United States in 1991. Although other journalists were arrested, killed, or often disappeared prior to 1998, Agada was never detained, arrested, or harmed by the government.

Agada came to the United States on a six-month visitor's visa in 1991 and failed to return prior to his visa's expiration. He filed an application for asylum in August of 1993. The Asylum Office initiated removal proceedings against Agada in 1998, charging him with being deportable under section 237(a)(1)(B) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1227(a)(1)(B) (Supp. IV 1998). Agada conceded deportability and sought the discretionary relief of asylum, see 8 U.S.C. § 1158 (Supp. IV 1998), withholding of removal, see 8 U.S.C. § 1231(b)(3) (Supp. IV 1998), or deferral of removal under section 3 of the Convention Against Torture, see 8 C.F.R. § 208.16(c) (2004). An IJ held a hearing on November 15, 1999, and determined that although Agada's testimony was generally credible, he had failed to establish an objectively reasonable fear of persecution if he returned to Nigeria. The IJ relied primarily on the changed conditions of the country that occurred in mid-1998. The BIA affirmed the IJ's decision and dismissed Agada's

appeal based on the IJ's "well-reasoned decision" (Add. at 2), and Agada seeks review.

## II.

An alien is eligible for asylum if he establishes that he is unwilling to return to his country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (Supp. IV 1998). Agada claims that he has a well-founded fear of persecution if he were returned to Nigeria based on his political opinion expressed while he worked as a journalist. Agada must establish that his fear is both genuinely subjective and reasonably objective. Wondmneh v. Ashcroft, 361 F.3d 1096, 1098 (8th Cir. 2004). Agada "must present credible, direct, and specific evidence of facts that show a reasonable person in [his] position would fear persecution if returned to [Nigeria]." Id. (internal marks omitted).

We review the BIA's denial of Agada's request for asylum to ensure that the decision is supported by substantial evidence in the record considered as a whole. Id. at 1097. Agada faces a "heavy burden of demonstrating that the evidence was so compelling that no reasonable fact-finder could fail to find the requisite fear of persecution." Id. (internal marks omitted). We review de novo Agada's claim that the BIA applied the wrong legal standard to his claim that the Nigerian government has a pattern and practice of persecuting journalists. Makonnen v. INS, 44 F.3d 1378, 1382 (8th Cir. 1995).

If a government has a pattern and practice of persecuting a group of persons, a person within that group may be entitled to asylum, despite a lack of evidence that he will be singled out for persecution. Membership in the group may be enough to entitle the person to asylum. See 8 C.F.R. § 208.13(b)(2)(iii) (2004) (an applicant need not establish a reasonable probability that he will be singled out for persecution

3

if returned if (A) he establishes a pattern and practice of persecution against a group similarly situated to the applicant on account of one of the five enumerated bases, and (B) he establishes his inclusion in, and identification with, the group).  We have defined a pattern or practice of persecution as requiring "organized or systematic or pervasive persecution."  Makkonnen, 44 F.3d at 1383.

Although neither the IJ nor the BIA referred to the regulation by name or citation, the IJ clearly considered Agada's claim that journalists were persecuted by the government for speaking out against it and that he would face persecution based on the fact that he was a journalist.  The IJ noted that journalists were detained and imprisoned and that the government ignored its constitutional guarantees of freedom of speech and freedom of the press under Nigeria's then president, General Abacha. The IJ determined that conditions faced by journalists changed drastically in mid-1998, however, following the death of General Abacha and his replacement by General Abubakar.  According to the U.S. Department of State Nigeria Country Report on Human Rights Practices for 1998 (Country Report), following General Abacha's death, the government significantly relaxed its restrictions on freedom of speech and of the press and respected these rights and practices.  The Country Report also noted that all detained journalists except one (who was imprisoned by a tribunal) were released in late 1998.  The government no longer threatened journalists with treason charges.  Journalists and editors of state media no longer feared suspension for their editorial decisions, although self-censorship continued.  The IJ properly applied the pattern or practice regulation to Agada's case.

The need for evidence of personal persecution does not disappear merely because the applicant claims that he is a member of a group against whom the government has a pattern of persecution.  "[T]he more egregious the showing of group persecution–the greater the risk to all members of the group–the less evidence of individualized persecution must be adduced."  Makkonnen, 44 F.3d at 1383 (internal marks omitted).  Because the evidence of persecution of journalists was not

so egregious, particularly given the changed conditions, the IJ properly considered the evidence that Agada's wife, sons, and siblings still live in Nigeria without harm; Agada's ability to obtain a Nigerian passport in 1989 and to renew it from New York in 1994; Agada's ability to leave the country without problems in 1991; and testimony from Agada's purported expert, who testified that journalists who, like Agada, had no prior contact with the State Security Service (SSS), were less likely to face harm than those with prior experience with the SSS if returned to Nigeria. See Feleke v. INS, 118 F.3d 594, 598 (8th Cir. 1997) (noting that applicant failed to establish that his position in the opposition movement was similar to those members who had been detained). The IJ's consideration of evidence particular to Agada did not detract from the IJ's consideration of the evidence, or lack thereof, concerning a pattern and practice of persecution against journalists.

Given Agada's own lack of prior persecution while working as a journalist in Nigeria while General Abacha was in control of the government, his lack of contact with the SSS, and the changed conditions facing journalists in Nigeria following General Abacha's death, we hold that the IJ's decision was supported by substantial evidence in the record. Agada's request for withholding of removal also fails, as that claim is based on the same set of facts and requires Agada to bear a heavier burden than does the standard for the granting of asylum. See Wondmneh, 361 F.3d at 1099 (noting the higher burden for establishing entitlement to withholding of removal, which requires a clear probability of persecution). Likewise, the evidence supports the IJ's decision to deny Agada's claim for protection under the Convention Against Torture because Agada failed to establish that it is more likely than not that he will be tortured if returned to Nigeria. See Al Tawm v. Ashcroft, 363 F.3d 740, 744 (8th Cir. 2004).

Finally, Agada asserts that the IJ improperly refused to consider evidence of continuing persecution of journalists, which was contrary to the 1998 Country Report that persecution against journalists had declined significantly after General Abacha's

death.  The IJ gave greater weight to the Country Report than to Agada's reports of continued persecution as reported by the Nigerian Media Monitor, an Internet source with which the IJ was unfamiliar.  The IJ considered the details of the Nigerian Media Monitor reports and noted that most of the stories could not be linked to the government or were reports that the journalists allegedly harmed were injured while attempting to report on dangerous but legitimate uses of police force.  (Add. at 16-18.)  Given the discrepancy between the detailed official Country Report that supports the IJ's decision and the tangentially relevant reports of the lesser known source, we cannot say "that no reasonable fact-finder could fail to find the requisite fear of persecution."  Wondmneh, 361 F.3d at 1097.

### III.

We have considered Agada's remaining arguments, and we find them unavailing.  The petition for review is denied.

_____