# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3232

_____

| | |
|---|---|
| Jin Zhu S-Cheng, | * |
| | * |
| Petitioner, | * |
| | * Petition for Review of an |
| v. | * Order of the Board of |
| | * Immigration Appeals. |
| John Ashcroft, Attorney General of | * |
| the United States, | * |
| | * |
| Respondent. | * |

_____

Submitted: June 15, 2004
Filed: August 12, 2004

_____

Before LOKEN, Chief Judge, BYE and MELLOY, Circuit Judges.

_____

BYE, Circuit Judge.

Jin Zhu S-Cheng, a citizen of the People's Republic of China, petitions for review of the Board of Immigration Appeals' (BIA's) order affirming an Immigration Judge's (IJ's) denial of her application for asylum and withholding of removal. We conclude this court lacks jurisdiction to review the agency's determination to initiate removal proceedings rather than exclusion proceedings. As to those claims over which we have jurisdiction, we find substantial evidence to support the decision of the BIA. Consequently, we deny the petition for review.

## I

Ms. Cheng's family paid a so-called snakehead, or smuggler, $20,000 to secure her passage from China to the United States. The smuggler gave her a Chinese passport to enter Peru, and once in Peru, provided her with an Indonesian passport to enter the United States. Ms. Cheng arrived at the Miami airport on March 21, 1993. Per the smuggler's instructions, she applied for admission by stating she was fleeing an arranged marriage and was seeking asylum. Immigration officers detected the fake Indonesian passport and issued her a Notice to Applicant For Admission Detained For Hearing Before an Immigration Judge (Form I-122), thus placing her in exclusion for seeking to gain admission by fraud. Although Form I-122 was served on Ms. Cheng, it was never filed with the Immigration Court. Following a couple of weeks in detention, she was released pending a hearing.

The exclusion hearing never occurred, but the immigration process continued to move forward. In May 1994, about one year after her entry, Ms. Cheng filed an application for asylum. As a basis for asylum, she falsely stated, upon advice of a travel agent, that she had been involved in democratic protests in China.

On January 10, 1996, Ms. Cheng gave birth to her son, Kevin Dong. A couple of months later, she married the father, Yong-Huan Dong, who was then a lawful permanent resident of the United States. On April 15, 1996, the INS approved Mr. Dong's I-130 visa petition on behalf of his wife. The notice document states Ms. Cheng, the beneficiary, is ineligible to apply for adjustment of status. On December 30, 1997, the INS served Ms. Cheng with a Notice to Appear (NTA), charging her with being removable as an alien who, at the time of entry, was inadmissible because she was not in possession of a valid entry document. On April 16, 1999, the INS withdrew the 1997 NTA and issued a new NTA charging Ms. Cheng with being removable based on her procurement of a visa by fraud or misrepresentation and her lack of a valid entry document.

On March 7, 2000, Ms. Cheng admitted the allegations in the NTA and conceded she was removable. In July 2000, she withdrew her 1994 asylum application and filed a new application. She declared the new basis for seeking asylum was her fear she would be persecuted under China's coercive population-control law. On November 3, 2000, Mr. Dong was sworn in as a United States citizen.

On October 16, 2002, Ms. Cheng testified at an evidentiary hearing before an IJ. She testified she was the oldest of six children and was born in 1973 in the Fujian Province of China, where her family still lives. There, local authorities harassed her mother for violating China's one-child law. Ms. Cheng further testified Chinese officials, in addition to imposing large fines, forced her mother to submit to sterilization by tubal ligation after the birth of the fourth child. The operation did not work, however, and Ms. Cheng's mother then gave birth to the two additional children. Her mother was also forced to submit to the insertion of an IUD device, which she had privately removed. Finally, Ms. Cheng admitted she lied in her earlier application. After hearing her testimony, the IJ found she was not a credible witness.

Ms. Cheng based her asylum claim on the fear she will suffer the same harassment her mother endured. "If I ever go back to China now," she explained, "I maybe will follow my mom's pattern and to be sterilized. Because Chinese government, Chinese regulation says any family has one son, then need to be sterilized." When asked whether her husband and son will accompany her to China if she is deported, Ms. Cheng replied: "They, my husband and son, will not allow me back to China because we all have, our house, everything is here." When asked whether she and her husband planned to have more children, Ms. Cheng replied, "Yes . . . . My husband and I want a couple of more children."

To rebut Ms. Cheng's testimony, the government presented several studies and articles on the enforcement of the population-control law in China's Fujian province.

One such study, the State Department's 1998 Profile of Asylum Claims on China, found that enforcement of the population-control law is very lax in the Fujian province. According to the State Department study, sterilization or the use of IUD appears to be urged only for families that have had two or perhaps three children, and the consulate did not find any cases of physical force actually being applied in connection with an abortion or sterilization. Another study, a 2000 fact-finding report from a Canadian political counselor, concludes Fujian local authorities lack the capacity or will to implement the national birth-control policy. The report noted that almost one-third of families in the region have three children or more, there are incentive programs instead of sanctions to encourage compliance, forced abortion and sterilization are reportedly no longer tolerated, sterilization by tubal ligation is encouraged but not required after two children, fines are viewed as a social subsidy fee for the cost to society of raising the additional children, and there is no evidence of any significant abuse of returning illegal migrants.

Based on the evidence presented at the hearing, the IJ found Ms. Cheng's fear of abortion and forced sterilization was based upon speculative facts. The IJ denied her applications for asylum and withholding of removal and issued a final order of removal. On August 14, 2003, the BIA dismissed her appeal, and this petition for review followed.

II

We review the BIA's findings of fact, including its decision that an applicant has failed to establish eligibility for asylum or withholding of removal, under a standard equivalent to the substantial-evidence standard. See Menendez-Donis v. Ashcroft, 360 F.3d 915, 918 (8th Cir. 2004). We reverse the BIA's denial of asylum or withholding of removal only if we find no reasonable fact-finder could arrive at the conclusion reached by the BIA. INS v. Elias-Zacarias, 502 U.S. 478, 483-84 (1992); 8 U.S.C. § 1252(b)(4)(B).

Persons seeking political asylum must show they have a well-founded fear of being persecuted "on account of race, religion, nationality, membership in a particular social group or political opinion" if they return to their country. See Agada v. Ashcroft, 368 F.3d 867, 868 (8th Cir. 2004) (quoting 8 U.S.C. § 1101(a)(42)(A)). In this case, the government concedes Congress has determined forcible abortion or sterilization constitutes persecution under the Immigration and Nationality Act (INA), 8 U.S.C. § 1101(a)(42)(B).

Under the deferential standard of review, we cannot say it would be impossible for a reasonable fact-finder to agree with the BIA's decision. In other words, substantial evidence supports the BIA's conclusion Ms. Cheng failed to prove she had a well-founded fear of suffering a forcible abortion or sterilization in China.

First, substantial evidence supports the BIA's finding that Ms. Cheng's fear of an abortion was based on hypothetical or speculative facts. To begin with, she did not show she was in violation of the one-child policy by having an American-born child living in the United States. Furthermore, even if she was in violation of the policy, it was speculative to conclude Chinese authorities would learn of the child. When the IJ asked Ms. Cheng whether her husband and son would accompany her to China, she suggested they would not, by stating, "They, my husband and son, will not allow me back to China because we all have, our house, everything is here." Although she testified she had general plans to have more children, it was unknown whether she would carry another child in China.

Similarly, because Ms. Cheng did not show she was in violation of the one-child law or that Chinese authorities would learn of her son, the BIA again concluded it was speculative to believe she would be subject to any forced-sterilization policy. Furthermore, the State Department and Canadian reports showed the Chinese government had replaced sanctions with incentives to encourage compliance with the

law; there was no evidence of forced sterilization or abortions in recent years especially in Ms. Cheng's home province; Chinese authorities urged sterilizations after a second or third child; and up to a third of the families in Ms. Cheng's province have three or more children.

Finally, the BIA's adoption of the IJ's finding Ms. Cheng lacked credibility was not erroneous. Ms. Cheng lied in her entry application and her first asylum request. Thus, based on her track record, the BIA had a reasoned basis to disbelieve her claims she planned to have another child and subjectively feared China's enforcement of the population-control law. As the IJ stated, hers was an "evolving claim changing as [she] sees fit."

Ms. Cheng also brings a procedural challenge to the BIA's decision. She maintains she should be in exclusion proceedings rather than removal proceedings because upon entering the United States in 1993 she was served Form I-122, the notice which normally initiated exclusion proceedings before April 1, 1997. Now that we have denied her petition for review of the denial of her asylum application and withholding of removal, the distinction is critical to Ms. Cheng.

In exclusion proceedings, she would be allowed the opportunity to adjust her status to that of a lawful permanent resident, pursuant to her husband's approved visa petition, without leaving the United States. In removal proceedings, in contrast, she cannot adjust her status without first returning to China and applying for an adjustment from there, a process which may take years. Ms. Cheng, in other words, faces a dilemma: She must either return to China alone, leaving behind her husband and American-born child, or uproot her entire family and return to the country from which she sought refuge in the first instance.

While some may sympathize with this dilemma, we are without jurisdiction to grant Ms. Cheng's requested relief. Section 242(g) of the INA provides that "no court

shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General *to commence proceedings*, adjudicate cases, or execute removal orders against an alien under the Act." 8 U.S.C. § 1252(g) (2003) (emphasis added). In other words, this court may hear challenges to immigration decisions but lacks jurisdiction to hear a challenge to the decision to forgo or initiate proceedings against an alien.

While Ms. Cheng characterizes her challenge as a prayer for exclusion proceedings, she is actually challenging the Attorney General's decision to commence removal proceedings. In essence, she wishes to invade the prosecutorial discretion of the agency and determine herself how the agency should proceed against her. Here, the agency chose to commence removal proceedings, not exclusion proceedings. See 8 C.F.R. § 1240.30 (stating an alien is considered to be in exclusion proceedings only upon filing Form I-122 with the Immigration Court). This choice was within the discretion of the agency and cannot be reviewed by the courts. See Reno v. Am. Arab Anti-Discrimination Comm., 525 U.S. 471, 486-87 (1999).

III

For the foregoing reasons, we deny the petition for review of the BIA's order and dismiss the procedural claim.

_____