# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 02-4144

———————

Lau May Sui,                                    *
                                                *
              Petitioner,                       *
                                                *    Petition for Review
       v.                                       *    of an Order of the
                                                *    Board of Immigration Appeals
John D. Ashcroft, Attorney General              *
of the United States,                           *
                                                *
              Respondent.                       *

———————

Submitted: April 16, 2004
    Filed:   January 21, 2005

———————

Before WOLLMAN, McMILLIAN and RILEY, Circuit Judges.

———————

McMILLIAN, Circuit Judge.

   May Sui Lau (Lau), a citizen of the People's Republic of China (China), petitions for review of an order of the Board of Immigration Appeals (BIA) affirming the decision of an immigration judge (IJ) denying her request for asylum or withholding of removal under the Immigration and Naturalization Act (INA) or protection under Article III of the Convention Against Torture (CAT). In re Lau May Sui, No. A77-38-311 (B.I.A. May 19, 2003) (per curiam) (affirming without opinion). In support of her petition, Lau argues that (1) the BIA abused its discretion in summarily affirming the IJ's decision without an opinion, (2) she qualifies for asylum or withholding or removal based upon past persecution or a well-founded fear of

persecution, and (3) she qualifies for relief under the CAT because it is more likely than not that she will be tortured if returned to China. For the reasons stated below, we deny Lau's petition.

## Background

Lau entered the United States on June 12, 1999, on a visitor's visa which permitted her to stay for six months. She overstayed her visa, and, in May of 2000, the Immigration and Naturalization Service (INS)[1] began removal proceedings against her. At a hearing before the IJ on October 17, 2000, Lau admitted that she had stayed after the expiration of her visa without permission. She applied for asylum, withholding of removal, or protection under Article III of the CAT. In support of her application, she submitted numerous documents, including her own affidavit. See Joint Appendix, Vol. II at 406-12 (Affidavit of Lau May Sui). The following is a summary of her affidavit, upon which the IJ's decision was substantially based.

Lau was born in China on July 27, 1955. In 1981, she and her then-husband moved to Saipan in the Mariana Islands, a territory of the United States, where they each held a job with a Japanese company. While living in Saipan, Lau gave birth to two children, both of whom are United States citizens. In 1992, Lau, her husband, and their two children moved to the city of Guangzhou in China. Soon thereafter, they began having financial problems. In 1993, Lau's husband began routinely taking long trips away from home and, by mid-1994, was no longer supporting the family. Lau was required to go back to work. Because she had lived abroad, Lau was classified as a temporary resident and, as such, was only eligible for temporary jobs. She found a temporary job that paid 1,700 Chinese dollars per month. Meanwhile,

---

[1]The Immigration and Naturalization Service is now the Bureau of Immigration and Customs Enforcement within the Department of Homeland Security.

because her children were American citizens, she was required to pay a "sponsor fee" of 10,000 Chinese dollars per year for their education.

In 1995, Lau became pregnant. Only she and her husband knew about the pregnancy. In December of that year, at five months gestation, Lau had an abortion. Lau explains the circumstances of the abortion as follows:

> Even as a non-resident and a temporary worker, I was still subject to periodical pregnancy check up (every six months) since I already had two children. This was mandated by the Chinese Family Planning regulations and enforced through the employers and local government Family Planning Office (FPO). In middle of September 1995, I found out that I became pregnant again. It was right at the time the periodical pregnancy check up was due. I knew that I would be in trouble because I did not have the "pregnancy permission," nor the residency registration; if I was found pregnant, I would be taken by the employer or the local FPO to have an abortion. I tried to avoid the test by alleging that I was in the middle of moving to another house. The employer smelled that something was wrong since I could not make the check up. I was suspended without pay at the end of September, and I was formally fired in December 1995. We lost the only source of income and I had to sell our car very cheaply to get the cash for our daily expenses.

> Upon being suspended [from work], I decided to move [in] with my father . . . . Although the living space was very small, we would be able to save some rent. However, in October when we were ready to move, I was told that we had to re-register as temporary at the local police station having jurisdiction over my father's home. To complete such registration, I had to first sign a "Contract" with local FPO and covenant that I would give no more birth to a child because I already have two children; otherwise, we would not be allowed to move in. I lost the job but had two small children to take care of. I had no choice but signing the "Contract," without telling the FPO officer that I was already pregnant at that time.

Having moved in with my father, I started to worry about the child in my body. I converted to Christian in 1985 when Andrew was born in Guam. It would be against God's wish and also my wish if I went to abort the child. I dreamed to have a miracle to let the child born. On the other hand, I was very clear about the consequences to our family if the child would be born. I and my children would be definitely removed from my father's home, and where could we go and how could we survive? . . . [T]he FPO officers were policing around all the time and sent us report cards for us to give more detailed information about our birth control methods and the results of the periodical check [up]s. If one day my pregnancy was caught by them, then I would not only be forced to abort the child but also be immediately sterilized as well. I also heard many more horrifying stories that when the hospitals find that the child was the third or fourth child, they would be put to death after they were born. I felt so depressed, angry and hopeless; without choice, in December of 1995, I went to the hospital quietly and had the child aborted. It was a boy, he was in his fifth month.

Id. at 408-09.

Once Lau had recovered from the abortion, she began looking for another job. As a temporary resident, her job opportunities were limited, so she applied to become a permanent resident. She was informed that, because she already had two children, she could not register as a permanent resident unless she produced a hospital certificate showing that she had been sterilized. She opposed sterilization. She considered registering only her children as permanent residents, in hopes that she could avoid the "sponsor fee" and other extra expenses that were imposed on her because of their American citizenship. She learned that her children could not become permanent residents unless she did so as well, which again would require her to be sterilized. Because she was not willing to be sterilized, neither she nor her children became permanent residents. Consequently, she remained limited to low-paying, temporary jobs and remained subject to the annual "sponsor fee" for her children's education.

-4-

In 1997, Lau began a job that required her to enforce the birth control policies at her place of business. She had been unaware of this job requirement at the time she accepted the job. Not wishing to "be responsible for the murder of [her] employee's children," but also financially unable to quit, she deliberately failed to perform her "family planning" duties or pretended not to know what they were. She was eventually terminated in March of 1999 for failing to perform those duties.

Regarding her own birth control practices, Lau's employers were responsible for ensuring her compliance with the applicable "family planning" requirements as long as she remained employed. Consequently, each time she started a new job, the FPO officer for whom she had signed the "No More Birth Contract" would contact her new employer about her situation. When she became unemployed after being fired in March of 1999, the FPO "re-assumed jurisdiction." Afterward,

> [t]he FPO officer . . . came to our home several times a week to push me to complete the sterilization. Sometimes she came with [a] police officer . . . to give us more pressure. They told us this would never end until the sterilization is performed. At last, in early May of 1999, FPO and police officers came and told my father that I must have the sterilization done by the end of the month, otherwise I and my children would be removed from the District.

Id. at 411-12.

On June 6, 1999, Lau and her husband officially divorced. By that time, Lau's husband had long since stopped supporting the family and had "taken up" with another woman. On June 12, 1999, Lau arrived in the United States at the age of 44.

In support of her application for relief, Lau also submitted a document entitled "Selected Translation of The Implementing Regulation of Guangzhou City Regarding The Enforcement of 'Family Planning Statute of Guangdong Province'" (hereinafter

"Guangzhou City regulations").  The Guangzhou City regulations state in relevant parts:

**Section Eleven**

The woman, who is registered resident of the city and gives birth to a child when she is working, traveling, visiting or studying abroad in a foreign country, Hong Kong, Macao or Taiwan, will not be permitted to have a second child regardless of the child's citizenship or residence.

**Section Thirteen**

If a couple already has two children and the woman is less than 40 years old, one of the parties shall adopt sterilization method.  The sterilization method shall be adopted in one of the following four situations:

. . . .

(3) The divorced/widowed person shall be sterilized upon the subsequent marriage if she has already had two children.

**Section Fourteen**

The woman who is pregnant beyond family planning must adopt remedial method.  If a couple gives birth to an unplanned second child, one of the parties must be sterilized regardless of his or her age.

**Section Twenty-Five**

To the women who are pregnant more than four months, the healthcare institutes must check the "Birth Permission Certificate" in order to provide services in pregnancy examination, maintenance of unborn child and child delivery.  To those who do not have the Certificate, the healthcare institutes shall impose remedial methods, and shall not provide pregnancy examination, maintenance of the unborn child, accepting for delivery (except in the emergency situation).  The healthcare institutes shall notify the local family planning office.  The women who have their second child, the healthcare institute shall perform the afterbirth sterilization according to the regulation.  To women who in the emergent labor of unplanned second or more

children, the healthcare institutes shall not issue the child's birth certificate until the women have been sterilized and fined.

Joint Appendix, Vol. II, at 422-23.

The IJ held an evidentiary hearing on April 24, 2001. Lau was the only witness to testify at the hearing. At that time, she was 45 years old and living in Missouri with her two teenage children. At the conclusion of the hearing, the IJ issued a written order denying her relief. He based the order upon an oral decision that he contemporaneously entered on the record. See id., Vol. I at 122-32 (Oral Decision of the Immigration Judge) (Apr. 24, 2001).

As indicated above, the BIA affirmed without an opinion the decision of the IJ denying Lau's request for asylum, withholding of removal, or protection under Article III of the CAT. In re Lau May Sui, No. A77-838-311 (B.I.A. May 19, 2003) (per curiam) (affirming without opinion). Lau timely filed this petition for review.

**Discussion**

Lau first argues that the BIA failed to comply with its own regulations when it elected to dispose of her case by an "affirmance without opinion" pursuant to 8 C.F.R. § 3.1(e)(4). On this basis, she requests that this court at least remand the case to the BIA for review by a three-member panel.

As a threshold matter, we consider the government's response that this court lacks jurisdiction to review the BIA's determination that the present case is suitable for summary affirmance without an opinion. In Ngure v. Ashcroft, 367 F.3d 975, 980-88 (8th Cir. 2004) (Ngure), filed after the present case was submitted, a panel of this court carefully considered the very same issue and concluded that, with the possible exception of cases involving a material intervening legal development, we

lack jurisdiction to review a decision by the BIA to affirm without opinion under 8 C.F.R. § 3.1(e)(4). In <u>Ngure</u>, the petitioner could not identify any intervening legal development that might have affected the decision in his case. This court therefore held that the BIA's decision to affirm without opinion could not be reviewed. <u>Id.</u> at 988. Similarly, in the present case, Lau has identified no intervening legal development that might materially affect the issues now before us. We therefore lack jurisdiction to review the decision of the BIA to affirm the IJ's decision without an opinion. The IJ's decision is the decision of the agency for purposes of judicial review.

On the merits, Lau first argues that the IJ relied upon unsubstantiated findings of fact and an erroneous view of the law in concluding that she is not eligible for asylum under 8 U.S.C. § 1158.[2] She maintains that she is a "refugee" within the

---

[2]Section 1158 of Title 8 of the United States Code permits granting of asylum where the alien is a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42)(A). "Refugee" is defined, in relevant part, as:

> . . . any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of . . . political opinion. . . . For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

8 U.S.C. § 1101(a)(42).

meaning of § 1101(a)(42) because she was forced to abort a pregnancy (which establishes past persecution on account of political opinion) and, further, because she has a well-founded fear that if returned to China she will be forced to undergo involuntary sterilization or will be persecuted for her resistance thereto (which establishes a well-founded fear of persecution on account of political opinion).

"We review the BIA's findings of fact, including its decision that an applicant has failed to establish eligibility for asylum or withholding of removal, under a standard equivalent to the substantial-evidence standard." S-Cheng v. Ashcroft, 380 F.3d 320, 322-23(8th Cir. 2004). "We reverse the BIA's denial of asylum or withholding of removal only if we find no reasonable fact-finder could arrive at the conclusion reached by the BIA." Id. at 323.

In the present case, the IJ recognized that an alien who has been forced to abort a pregnancy has suffered past persecution on account of political opinion and, moreover, that "the term, forced to abort, includes not just physical force, but also other types of pressure applied to her." Joint Appendix, Vol. I at 127 (IJ's Oral Decision at 6 & n.1). The IJ nevertheless found that Lau had not been forced to abort her pregnancy in December of 1995. The IJ explained as follows.

> First, there is no indication that the Chinese officials at that time communicated with her, acknowledging that they knew that she was pregnant. They did not send her any notice indicating that any penalties or sanctions would be imposed on her because of her pregnancy. Second, the respondent herself admitted that she kept information about the pregnancy from others, and it was a secret between herself and her husband. Thirdly, in her affidavit, the respondent clearly acknowledges that the abortion was because she felt "so depressed, angry, and hopeless, without a choice. In December of 1995, I went to the hospital quietly and had the child aborted." There is no indication that government officials were the proximate cause of that decision. The respondent's psychological state of being depressed, angry and hopeless

-9-

could be attributed to many different causes; her unraveling marriage, her husband taking up with another woman, her husband failing to support her since December 1994. This is not the sort of "forced to abort a pregnancy or to undergo involuntary sterilization" which is contemplated.

Id. at 128.

To begin, we agree with Lau's argument that the record does not sufficiently support the IJ's suggestion that Lau's feelings of depression, anger, hopelessness, and lack of choice – contributing to her decision to abort the pregnancy – stemmed from desperation over her failing marriage. As stated above, Lau explained those feelings in her affidavit as follows:

> Having moved in with my father, I started to worry about the child in my body. I converted to Christian in 1985 when Andrew was born in Guam. It would be against God's wish and also my wish if I went to abort the child. I dreamed to have a miracle to let the child born. On the other hand, I was very clear about the consequences to our family if the child would be born. I and my children would be definitely removed from my father's home, and where could we go and how could we survive? . . . [T]he FPO officers were policing around all the time and sent us report cards for us to give more detailed information about our birth control methods and the results of the periodical check [up]s. If one day my pregnancy was caught by them, then I would not only be forced to abort the child but also be immediately sterilized as well. I also heard many more horrifying stories that when the hospitals find that the child was the third or fourth child, they would be put to death after they were born. I felt so depressed, angry and hopeless; without choice, in December of 1995, I went to the hospital quietly and had the child aborted. It was a boy, he was in his fifth month.

Id. at 408-09.[3]

---

[3]Moreover, at the April 24, 2001, hearing before the IJ, Lau additionally testified on direct examination as follows:

> Q.  Can you tell this Court what was the reason, what kind of pressure you were under, and if you had to go to the abortionist?
>
> A.  At that time, if I were not to do that abortion, I would not have been able to move into my father's home.  My children would not have been able to go to school.  I did not have a job.  Also, there was no place for me to be able to deliver the child there.

Joint Appendix, Vol. I at 166 (transcript of hearing).

> On cross-examination by the government's attorney, Lau added the following:
>
> Q.  . . . Can you tell the Court, specifically, item by item, what factors played a role in your making that decision to [go] through [with] the abortion?
>
> A.  Number one, the pregnancy is a secret between me and my husband. Nobody else knew that.  If it were known to [the family planning officer], finding me, kidnap me to the hospital to force an abortion is entirely possible.  Because it was not known to anybody else besides me and my husband, I thought that even if I wanted to deliver this child, there was no way, no where can I do that.  Even if I deliver that child, this child would not live long.  Next, if I did not go do the abortion, my father may lose his retirement pay.  My two sisters would also be adversely affected by that.  And me, myself, would have no way, no place to live.  And my two children would have no place to live.  And also, it would be impossible for me to find another long-term job.  There would be no way out for me if I made another decision.

Id. at 191.

In other words, the evidence established that Lau's decision to abort her pregnancy was based, not upon desperation over her failing marriage, but rather her fears about the possible consequences to herself, her family, and her unborn child if she were to continue the pregnancy. She decided to abort the pregnancy privately at five months gestation rather than risk more dire consequences in later months. The difficult question for us thus becomes whether, under these circumstances, a reasonable fact-finder could nevertheless conclude that Lau was not "forced" to abort her pregnancy within the meaning of 8 U.S.C. § 1101(a)(42).

We read the phrase "forced to abort a pregnancy" in § 1101(a)(42) to require Lau to show that Chinese officials used some sort of physical force or undue pressure with the intent to cause, and which did cause, the particular abortion in question. See Miranda v. INS, 139 F.3d 624, 627 (8th Cir. 1998) ("persecution" under § 1101(a)(42) involves, among other things, harm or suffering inflicted upon an individual because of the individual's belief or characteristic the persecutor sought to overcome). The record reveals that Chinese officials subjected Lau to direct and indirect economic and psychological pressures with the intent to cause her to be sterilized. It is undisputed that Lau was never sterilized. There is no evidence, however, that Chinese officials ever pressured her to have the particular abortion at issue; indeed, it is undisputed that no Chinese official knew at the time that Lau was pregnant. While Lau did provide general, anecdotal evidence to explain her fears of a forced late-term abortion, forced sterilization, and possibly the death of her child upon birth, a reasonable fact-finder could conclude, under the particular facts of this case, that she was not likely to suffer any of those consequences. As to Lau's reliance upon the Guangzhou City regulations to argue that she would have been forced to undergo involuntary sterilization upon the birth of her third child, the IJ reasonably disagreed with her interpretation of the relevant provisions as they applied to her circumstances, given her age (40 at the time of her pregnancy) and the fact that both of her children had been born abroad. In sum, we hold that a reasonable fact-finder could conclude

-12-

that Lau was not "forced to abort a pregnancy" within the meaning of 8 U.S.C. § 1101(a)(42).

Lau also contends that, independent of her claim of past persecution, she has established a well-founded fear that, if returned to China, she will be forced to undergo involuntary sterilization or will be persecuted for resistance thereto. She argues that "her testimony, deemed credible by the Immigration Judge and backed by the documentary evidence submitted, shows a serious human rights problem in China, including forced abortions, infanticide, and mandatory sterilization." Brief for Appellant at 23.

In order to establish her eligibility for asylum on this basis, Lau must establish that her fear of future persecution is both subjectively and objectively well-founded. Hassanein v. Ashcroft, 380 F.3d 324, 327 (8th Cir. 2004) (Hassanein) (citing Al Tawm v. Ashcroft, 363 F.3d 740, 743 (8th Cir. 2004) (Al Tawm)). In the present case, the IJ concluded that Lau did not have an objectively well-founded fear of future persecution because, among other reasons:

> [Lau] did sign some documents . . . which were to meet the Chinese officials' demands that she be sterilized, but she was never actually required to report at a hospital to be sterilized, even after she conceived the third child and stayed in China in 1995 to 1999. Her contention that she would be forcibly sterilized upon her return therefore is not supported by the facts of this case. Since she was not forcibly sterilized for those four years, it is unlikely that now, at age 45, divorced from her husband and single, that she would be forced to meet that demand.

Joint Appendix, Vol. I at 130.

In view of these facts, as well as the passage of several more years since the IJ's decision, we hold that a reasonable fact-finder could conclude that Lau does not

-13-

have an objectively well-founded fear of involuntary sterilization or persecution for resistance thereto if returned to China. Accordingly, we conclude that the BIA's decision that Lau has failed to establish eligibility for asylum is supported by substantial evidence on the record as a whole.

Lau advances no additional arguments to support her assertion that she qualifies for withholding of removal under 8 U.S.C. § 1231(b)(3). See Brief for Appellant at 23-24 ("For largely the same reasons that Ms. Lau is eligible for asylum, she is entitled to withholding of [removal]"). Accordingly, we hold that the BIA's decision denying her application for withholding of removal is also supported by substantial evidence on the record as a whole. See Hassanein, 380 F.3d at 328 ("Because [the petitioner] 'has failed to carry the burden of proof to demonstrate he is eligible for asylum, he also fails under the higher burden of proof required for withholding [of removal].'") (quoting Al Tawn, 363 F.3d at 744)).

Similarly, Lau adds no new factual arguments to support her claim for protection under Article III of the CAT. She fails to provide any legal basis for the proposition that, notwithstanding her failure to establish a well-founded fear of persecution under the INA, we may nevertheless conclude, on the very same set of facts, that she is entitled to protection under Article III of the CAT. Lau merely argues: "The record clearly proves that it is more likely than not that Petitioner will be tortured by the Chinese government if she is returned, and thus [s]he merits relief under Article III of the Torture Convention." Brief for Appellant at 28-29. Because Lau has not shown how she has met her burden of proof under Article III of the CAT, she merits no relief on this claim.

**Conclusion**

For the foregoing reasons, Lau's petition for review is denied.

_____