# In re T-Z-, Respondent

*Decided May 9, 2007*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) An abortion is forced by threats of harm when a reasonable person would objectively view the threats for refusing the abortion to be genuine, and the threatened harm, if carried out, would rise to the level of persecution.

(2) Nonphysical forms of harm, such as the deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment, or other essentials of life, may amount to persecution.

(3) When an Immigration Judge denies asylum solely in the exercise of discretion and then grants withholding of removal, 8 C.F.R. § 1208.16(e) (2006) requires the Immigration Judge to reconsider the denial of asylum to take into account factors relevant to family unification.

FOR RESPONDENT: Gang Zhou, Esquire, New York, New York

FOR THE DEPARTMENT OF HOMELAND SECURITY: Wendy Leifer, Assistant Chief Counsel

BEFORE: Board Panel: FILPPU and PAULEY, Board Members. Dissenting Opinion: COLE, Board Member.

FILPPU, Board Member:

In a decision dated December 4, 2003,[1] an Immigration Judge granted the respondent's application for withholding of removal, denied his application for asylum as a matter of discretion, denied his request for protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988), and ordered his removal to a country other than China. The Department of Homeland Security ("DHS," formerly the Immigration and Naturalization Service) has appealed the Immigration Judge's grant of withholding of removal. The respondent has appealed the discretionary denial

---

[1] The date on the Immigration Judge's decision is incorrectly stated as October 10, 2002.

of his asylum application.[2]  Both appeals will be sustained in part, and the record will be remanded for further proceedings.

## I.  FACTUAL AND PROCEDURAL HISTORY

The respondent, a native and citizen of China, testified in support of his applications for asylum and withholding of removal that his wife was compelled to submit to two abortions, the first in November 1992 and the second in December 1998.

Describing the circumstances of the 1992 abortion, the respondent stated that his wife's first pregnancy was discovered during a physical checkup at her place of work in Dalien City, Liaoning Province.  The birth control official told the respondent and his wife that they were too young to be given permission to have the child, because the Dalien City birth control regulation required that both parents be 25.  At the time, the respondent was over 25, but his wife was a few months short of the required age.  The respondent and his wife begged for permission to have the child.  They were told that if they had the child, his wife would be dismissed from her job.  The respondent testified that he and his wife earned low salaries, and that his wife's income was about 50 to 60 percent of their combined income.  He stated further that if they had to depend on his salary alone, it would have been "hard to keep up with my living expenses; a difficult life."  Therefore, he explained, he and his wife decided to go through with the abortion.

The second abortion occurred 6 years later under the following circumstances.  After the birth of a daughter in January 1997, the respondent and his wife used various forms of birth control, evidently in an effort to comply with China's "one-child" policy.  Nonetheless, the respondent's wife became pregnant again, and her condition was discovered during a physical exam at her place of work on December 22, 1998.  She was pressured to have an abortion and, according to the respondent, "immediately aborted the child."

At the time, the respondent was away working on a construction project and was not contacted about his wife's pregnancy.  When he learned what had happened, he was upset because he felt he should have been informed of the situation before anything was done.  He went to his wife's working unit and complained to the birth control supervisor that he should have been allowed to "be by [his wife's] side taking care of her."  He explained that at the time of the second abortion, he and his wife would have liked to have had another

---

[2]  The respondent's appeal was untimely filed.  Under the circumstances in this case, we find that the respondent has satisfied the requirements set forth in *Matter of Assaad,* 23 I&N Dec. 553 (BIA 2003), and we accept his appeal on certification.

child, but that they had not attempted to have a second child because the authorities would have dismissed his wife from her job, refused to register the second child, and possibly forced one of them to undergo sterilization.

The Immigration Judge found that the respondent's testimony regarding his wife's abortions was credible and that the abortions were "coerced" within the meaning of the coercive family planning provision of the "refugee" definition at section 101(a)(42) of the Immigration and Nationality Act, 8 U.S.C. §1101(a)(42) (2000). He therefore found that the respondent had established past persecution and a well-founded fear of persecution based on his wife's abortions and, consequently, that he was eligible for asylum and withholding of removal. *See Matter of C-Y-Z-*, 21 I&N Dec. 915 (BIA 1997), *reaff'd*, *Matter of S-L-L-*, 24 I&N Dec. 1, 8 (BIA 2006); *Matter of X-P-T-*, 21 I&N Dec. 634 (BIA 1996). The Immigration Judge reasoned as follows:

> Now since the law seems to say that an individual or the spouse of an individual who had undergone a coercive abortion will be deemed to have suffered past persecution on account of their political opinion and will still be considered to have a future fear of persecution, I must examine whether the abortions were in fact coercive. The respondent's attorney is arguing that they were. The facts presented by the respondent and his wife were that if she had refused to undergo the abortion, that she would have been fired from her job, that they would have been financially unable to support themselves, that they might have been forcibly sterilized, that had they managed to have the child, the child would not have been registered in the household which would have caused other hardships.
>
> (Indiscernible) the Government has argued that because the wife reported when told to both times for the abortion, that it was not coercive within the meaning of the statute and case law. I'm going to agree in this case with the respondent that this is, in fact, coercive even if the respondent's wife was not dragged kicking and screaming against her will. I think those types of factors, the fact that had she refused to, they would have been harmed in so many ways really is coercive, really is within the congressional intent of the statute, and therefore, that the respondent's wife did suffer what under case law would be considered to be persecution; meaning that the respondent has established a well-founded fear of future persecution on account of his political opinion.

Ultimately, the Immigration Judge determined that the respondent was not deserving of asylum because he had not been truthful with the court about his use of an alias, his places of residence and work, and his record of arrest and conviction in the United States. Therefore, the Immigration Judge granted the respondent withholding of removal to China but denied his asylum application in the exercise of discretion.

## II.  ISSUES ON APPEAL

The DHS challenges the Immigration Judge's grant of withholding of removal.  First, the DHS argues that the Immigration Judge erred in finding the respondent credible in regard to his claims for asylum and withholding of removal.  Second, the DHS asserts that the respondent failed to demonstrate that he was entitled to asylum or withholding of removal based on his wife's submission to abortions based on economic threats, including the loss of her job.  The respondent argues that the Immigration Judge erred in denying asylum in the exercise of discretion.

## III.  ANALYSIS

### A.  Credibility

The DHS contends that the Immigration Judge erred in crediting the respondent's testimony concerning the circumstances of his wife's abortions, because the respondent provided incomplete or inaccurate information in his asylum application and initial testimony regarding his employment and places of residence in this country, as well as his record of arrest and conviction.  The Immigration Judge determined that the respondent's omissions and misrepresentations regarding the use of an alias, other addresses, employment, and convictions were extraneous to the core of his asylum application and did not tarnish the believability of his claim.

Given the Immigration Judge's explanation for his credibility determination, including his assessment of the respondent's demeanor, as well as the detail and consistency of the testimony regarding the abortions, we find the Immigration Judge's credibility determination was not clearly erroneous. *See* 8 C.F.R. § 1003.1(d)(3)(i) (2006).  The Immigration Judge explicitly based his credibility determination on his observations of the respondent's demeanor.  He concluded that the respondent "had given detailed and seemingly sincere testimony to the fact that his wife had undergone two abortions [and] had given us documentation in support of that, including a letter from the wife."  Inasmuch as we find no clear error in the Immigration Judge's conclusion regarding the respondent's credibility, we will dismiss this portion of the DHS's appeal.

### B.  Meaning of a "Forced Abortion"

Our starting point in determining whether the respondent demonstrated eligibility for asylum or withholding of removal is the definition of a refugee

in the Act.  Section 101(a)(42) of the Act defines the term "refugee" in relevant part as follows:

> The term "refugee" means (A) any person who is outside any country of such person's nationality . . . who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of that country *because of persecution or a well-founded fear of persecution* on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .  For purposes of determinations under this Act, a person who has been *forced to abort a pregnancy* or to undergo involuntary sterilization, *or who has been persecuted for failure or refusal to undergo such a procedure* or for other resistance to a coercive population control program, shall be *deemed to have been persecuted* on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure *or subject to persecution for such failure, refusal, or resistance* shall be deemed to have a well founded fear of persecution on account of political opinion.

(Emphasis added).  We have held that an alien whose spouse was forced to abort a pregnancy may qualify as a refugee.[3]  *Matter of S-L-L-*, *supra*, at 8.

The critical issue in this case is whether the respondent's wife was "forced to abort a pregnancy" as that phrase is used in the definition of a refugee.  The term "forced" is not defined in the Act.  We derive the meaning of a "forced" abortion by considering the ordinary meaning of the term in light of the context and structure of the general definition of a "refugee" in the first sentence of section 101(a)(42) of the Act and the specific references to forced procedures or persecution resulting from avoiding abortions or sterilizations in the final sentence.[4]

The fundamental concept at the core of the refugee definition is the fact of "persecution" or a "well-founded fear of persecution" based on a ground protected under the Act.  The provisions addressing a "coercive population control program," which were added to the definition in 1996, are similarly grounded in the demonstration of past persecution or a well-founded fear of persecution.  An applicant establishes past persecution by demonstrating that he or she was "forced to abort a pregnancy or to undergo involuntary

---

[3]  There is no dispute that the respondent and his spouse were legally married at the time of the abortions.

[4]  Another reference to forced abortions appears in 8 U.S.C. § 1182e(a) (2000), which directs, with certain exceptions, that the Secretary of State may not issue a visa to a foreign national who has been "directly involved in the establishment or enforcement of population control policies forcing a woman to undergo an abortion against her free choice or forcing a man or woman to undergo sterilization against his or her free choice."  This provision was enacted in 1999, after the refugee definition was amended to address coercive family planning.

sterilization, *or [that he or she] has been persecuted for failure or refusal to undergo such a procedure* or for other resistance to a coercive population control program." Section 101(a)(42) of the Act (emphasis added). Alternatively, an applicant may establish a well-founded fear of persecution by demonstrating that he or she would be forced to undergo such a procedure or be "*subject to persecution for* such failure, refusal, or resistance." *Id.* (emphasis added).

The refugee definition encompasses the situations of persons who have been "forced to abort a pregnancy," as well as those who have been "*persecuted for* failure or refusal to undergo such a procedure." Section 101(a)(42) of the Act (emphasis added). One who refuses to submit to an abortion may qualify as a refugee by demonstrating that the refusal led to infliction of harm by the government so severe that it amounts to persecution. Conversely, one who is forced to submit to an abortion is also "deemed to have been persecuted." *Id.*

The context and structure of the statute require that there be actual harm or a reasonable fear of future harm, amounting to persecutory harm, in order for an applicant to qualify as a "refugee." Accordingly, we find that the question whether an abortion is "forced" within the meaning of the coercive population control provisions should be evaluated in terms of whether the applicant would have otherwise been subjected to harm of sufficient severity that it amounts to persecution. Therefore, an abortion is "forced" within the meaning of the Act when a reasonable person would objectively view the threats for refusing the abortion to be genuine, and the threatened harm, if carried out, would rise to the level of persecution.

Our interpretation of a "forced" abortion is consistent with the guidelines initially developed by the Office of General Counsel of the Immigration and Naturalization Service for implementing the coercive family planning provision of the refugee definition. These guidelines provided the following framework for addressing the question of "forced" abortions:

> The amended refugee definition provides that a person who is forced to abort a pregnancy or to undergo an involuntary sterilization is deemed to have been persecuted on account of political opinion. Accordingly, to establish past persecution based on an abortion or sterilization, the applicant must demonstrate that he or she was "forced" to undergo the procedure. We believe that the procedure should be considered "forced" only when the applicant demonstrates that he or she was physically coerced *or would have faced harm rising to the level of persecution if he or she had failed or refused to undergo the procedure*. For instance, the imposition of a fine alone would not be a sufficient basis to consider the procedure to have been "forced," unless the fine would result in such a substantial economic deprivation that

> it would constitute persecution. A sterilization or abortion effected through physical coercion or the threat of a substantial prison term would, in most cases, meet the requirement of being "forced."

Memorandum from the Office of the General Counsel to INS officials (Oct. 21, 1996), *reprinted in* 73 Interpreter Releases, No. 43, Nov. 11, 1996, app. I at 1597, 1600 (emphasis added).

We essentially agree with the framework described in the Service memorandum. Persecutory force under the statute is force which, if carried out, would meet or exceed the level of harm required to demonstrate persecution. The term "persecution" is not limited to physical harm or threats of physical harm and may include threats of economic harm, so long as the threats, if carried out, would be of sufficient severity that they amount to past persecution. Not all threats of fines, wage reduction, or loss of employment, however, will suffice to indicate that submission to an abortion was "forced" within the meaning of the Act. An abortion is forced by threats of harm for refusal–whether in the form of physical harm, economic sanctions, or otherwise–when a reasonable person would objectively view the threats as genuine, and the threatened harm, if carried out, would meet or exceed the threshold level of harm for past persecution.

Recent court decisions have recognized that the ordinary meaning of the term "forced" includes forms of coercion beyond the use of physical force or restraint, or the threat of physical force or restraint. *See Ding v. Ashcroft*, 387 F.3d 1131, 1138-39 (9th Cir. 2004) (quoting dictionary definitions of "forced," including *Webster's New International Dictionary* 887 (3d ed. 1981), which defines the term with reference to "physical, moral, or intellectual means or by exigencies of circumstance"); *see also Wang v. Ashcroft*, 341 F.3d 1015, 1020 (9th Cir. 2003) (holding that an abortion compelled under threats of wage reduction, job loss, and unreasonably high fines was a "forced abortion" within the meaning of section 101(a)(42) of the Act).

An abortion is not "forced" within the meaning of the refugee definition, however, unless the threatened harm for refusal would, if carried out, be sufficiently severe that it amounts to persecution. We disagree with the dissent and the decisions in *Ding* and *Wang* to the extent that they suggest that threats of economic harm that do not rise to the level of persecution, if carried out, would suffice to demonstrate that an abortion was "forced" within the meaning of the statute. The statute requires that the abortion be "forced," not merely that a person choose an unpreferred course of action as the result of some pressure that sways the choice. The mere fact of submission to pressure

only tells us that the particular person's preference was altered. It is insufficient, by itself, to tell us the level of that pressure or whether it reasonably can be equated to "force."

The DHS does not claim that the respondent and his wife faced only idle threats. In this case, then, the question is whether the threatened loss of the wife's employment, potential fines, and other likely consequences of refusing or resisting the abortion would, if carried out, have amounted to persecutory force.

### C. Economic Harm Amounting to Persecution

In a recent decision, the United States Court of Appeals for the Second Circuit indicated that it was unable to determine the standard we applied for assessing when economic harm amounts to persecution. *Mirzoyan v. Gonzales*, 457 F.3d 217, 221-22 (2d Cir. 2006). As the court pointed out, the Board has at times referred to the "deliberate imposition of substantial economic disadvantage," a standard applied by the Ninth Circuit in *Kovac v. INS*, 407 F.2d 102, 107 (9th Cir. 1969), and subsequently adopted by a number of other circuit courts. *See, e.g.*, *Guan Shan Liao v. U.S. Dep't of Justice*, 293 F.3d 61 (2d Cir. 2002); *Yong Hao Chen v. U.S. INS*, 195 F.3d 198, 204 (4th Cir. 1999); *Borca v. INS*, 77 F.3d 210, 216 (7th Cir. 1996); *Baka v. INS*, 963 F.2d 1376, 1379 (10th Cir. 1992); *Berdo v. INS*, 432 F.2d 824, 845-46 (6th Cir. 1970). We have also stated that persecution "could consist of economic deprivation or restrictions so severe that they constitute a threat to an individual's life or freedom." *Matter of Acosta*, 19 I&N Dec. 211, 222 (BIA 1985), *overruled on other grounds by INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987).[5]

As explained below, in considering economic persecution, we apply the standard for evaluating nonphysical forms of suffering or harm referred to in *Matter of Laipenieks*, 18 I&N Dec. 433 (BIA 1983), *rev'd on other grounds*, 750 F.2d 1427 (9th Cir. 1985). That standard was outlined in a 1978 House Report as follows:

---

[5] In *Mirzoyan v. Gonzales*, *supra*, the applicant for asylum was denied admission to a prestigious college, was unable to find a job in her profession, and was discharged from her job as an unskilled worker on account of her ethnicity. The court suggested that Mirzoyan "likely could not prevail under the standard referenced in *Acosta*, . . . but might prevail under the *Kovac* standard" and remanded to the Board to explain which standard it had applied. *Id*. at 223.

> Generally [the] case law has described persecution as the infliction of suffering or harm, under government sanction, upon persons who differ in a way regarded as offensive (*e.g.*, race, religion, political opinion, etc.), in a manner condemned by civilized governments. The harm or suffering need not [only] be physical, but may take other forms, *such as the deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment or other essentials of life.*

H.R. Rep. No. 95-1452, at 5, *as reprinted in* 1978 U.S.C.C.A.N 4700, 4704, 1978 WL 8575 ("House Report") (emphasis added), *quoted in Matter of Laipenieks, supra*, at 457.[6]

The formulation in the 1978 House Report encapsulates the forms of nonphysical harm, including economic harm, that may amount to persecution. In one sense, economic persecution may involve the deliberate deprivation of basic necessities such that life or freedom is threatened. This form of persecution is described by *Matter of Acosta* and the second clause of the sentence from the House Report quoted above with emphasis. Alternatively, there may be situations in which, for example, an extraordinarily severe fine or wholesale seizure of assets may be so severe as to amount to persecution, even though the basic necessities of life might still be attainable. *See* H.R. Rep. No. 95-1452, at 6, *as reprinted in* 1978 U.S.C.C.A.N. at 4705.[7] This form of persecution is covered by the "economic disadvantage" test in *Kovac v. INS, supra*, and by the first clause of the quoted sentence in the House Report.[8] *See also Mirzoyan v. Gonzales, supra*, at 223 (suggesting that "the substantial economic disadvantage" test is somewhat broader than the *Acosta* formulation).

The standard for nonphysical persecution set forth in the 1978 House Report and endorsed in *Matter of Laipenieks, supra*, has been applied by the Fifth Circuit. *See, e.g., Zhao v. Gonzales*, 404 F.3d 295, 307 (5th Cir. 2005);

---

[6] The 1978 House Report accompanied the so-called "Holtzman Amendment," Pub. L. No. 95-549, 92 Stat. 2065 (1978), adding provisions to the Immigration and Nationality Act to provide grounds for exclusion and deportation of Nazi persecutors.

[7] The Seventh Circuit, for example, has held that the conduct amounting to persecution "'need not necessarily threaten the petitioner's life or freedom.'" *Koval v. Gonzales*, 418 F.3d 798, 805 (7th Cir. 2005) (quoting *Borca v. INS, supra*, at 214).

[8] Notably, in both *Laipenieks* and *Acosta*, we cited to *Kovac v. INS, supra*, but without any discussion of the "substantial economic disadvantage test." *See also Matter of Barrera*, 19 I&N Dec. 837, 847 (BIA 1989) (referring to *Kovac* in finding that asylum applicants from Cuba failed to show that returning Marielitos who were not considered a threat by Cuba had been "denied employment, education, housing, permission to travel, or other benefits of this sort").

*Eduard v. Ashcroft*, 379 F.3d 182, 187 (5th Cir. 2004); *Mikhael v. INS*, 115 F.3d 299, 303 n.2 (5th Cir. 1997); *Abdel-Masieh v. U.S. INS*, 73 F.3d 579, 583-84 (5th Cir. 1996). Other courts have also combined both aspects of the standard set forth in the House Report. *See, e.g.*, *Li v. Attorney General of the U.S.*, 400 F.3d 157, 169 (3d Cir. 2005) (referring to "severe economic disadvantage which could threaten [a] family's freedom if not their lives" as an example of persecutory harm). A recent Ninth Circuit decision combines the *Kovac* formulation with a reference to the *Acosta* "threat to life or freedom" benchmark for severity of harm. *Zehatye v. Gonzales*, 453 F.3d 1182, 1186 (9th Cir. 2006) (referring to "substantial economic deprivation that constitutes a threat to life or freedom"); *see also Gormley v. Ashcroft*, 364 F.3d 1172, 1178 (9th Cir. 2004) (stating that "mere economic disadvantage alone does not rise to the level of persecution," with a reference to the *Acosta* requirement that the deprivation be "'so severe that [it] constitute[s] a threat to an individual's life or freedom'").

Both the *Acosta* formulation and the House Report use the term "severe" in describing the threshold level of harm required for persecution. The House Report's reference to the "deliberate imposition of severe economic disadvantage" tracks the *Kovac* test for economic persecution but substitutes the term "severe" for "substantial," which was used in *Kovac*. The House Report also recognizes that "the deprivation of liberty, food, housing, employment or other essentials of life" may amount to persecution.[9] This clause in the House Report corresponds to the reference in *Acosta* to "economic deprivation or restrictions so severe that they constitute a threat to an individual's life or freedom." *Matter of Acosta*, *supra*, at 222.

The House Report's use of the term "severe" as the benchmark for the level of harm is consistent with the principle that persecution is an "'extreme concept that does not include every sort of treatment our society regards as offensive.'" *Nagoulko v. INS*, 333 F.3d 1012, 1016 (9th Cir. 2003) (quoting *Korablina v. INS*, 158 F.3d 1038, 1044 (9th Cir. 1998)). In this regard, the United States Supreme Court has stated that a fear of persecution is well

---

[9]   The United Nations *Handbook on Procedures and Criteria for Determining Refugee Status* states that "it may be inferred that a threat to life or freedom on account of race, religion, nationality, political opinion or membership of a particular social group is always persecution." Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* para. 51, at 14 (Geneva 1988). The *Handbook* also provides that in order to constitute persecution, there must be "consequences of a substantially prejudicial nature for the person concerned, e.g. serious restrictions on his right to earn his livelihood, his right to practise his religion, or his access to normally available educational facilities." *Id.* para. 54, at 15.

founded when an applicant "'can establish, to a reasonable degree, that his continued stay in his country of origin has become intolerable to him for the reasons stated in the definition, or would for the same reasons be intolerable if he returned there.'" *INS v. Cardoza-Fonseca*, *supra*, at 439 (quoting Office of the High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status*, Ch. II B(2)(a) § 42 (Geneva 1979)). Use of the term "intolerable" to describe the level of harm for persecution supports setting the minimum threshold for economic persecution at "severe economic disadvantage." Therefore, to the extent that use of the term "substantial" in the *Kovac* formulation may suggest a lesser standard than the term "severe" in the House Report's formulation, we endorse the House Report's requirement that an applicant for asylum must demonstrate a "severe economic disadvantage."[10]

Persecution requires a showing of more than mere economic discrimination. *Ahmed v. Ashcroft*, 341 F.3d 214 (3d Cir. 2003). The economic difficulties must be above and beyond those generally shared by others in the country of origin and involve noticeably more than mere loss of social advantages or physical comforts. *Cheng Kai Fu v. INS*, 386 F.2d 750, 753 (2d Cir. 1967). Rather, the harm must be "of a deliberate and severe nature and such that is condemned by civilized governments." H.R. Rep. No. 95-1452, at 7, *as reprinted in* 1978 U.S.C.C.A.N. at 4706.

An applicant, however, need not demonstrate a total deprivation of livelihood or a total withdrawal of all economic opportunity in order to demonstrate harm amounting to persecution.[11] *Kovac v. INS*, *supra*, at 106-07; *see also Koval v. Gonzales*, 418 F.3d 798, 806 (7th Cir. 2005); *Li v. Attorney General of the U.S.*, *supra*, at 168 (rejecting the total deprivation of

---

[10] We therefore do not endorse an open-ended "substantial economic disadvantage" test. A heavy fine leveled against a wealthy individual might be seen as a substantial economic disadvantage, even if the person remains relatively wealthy and experienced no meaningful change in life style or standard of living. We would be unlikely, without more, to view a one-time fine of this sort as amounting to a "severe economic disadvantage" within the meaning of the definition in the 1978 House Report.

[11] Until 1965, withholding of deportation under former section 243(h) of the Act, 8 U.S.C. § 1253(h) (1964), required a showing that the alien "would be subject to physical persecution." Under this standard, as one court put it, "[E]conomic proscription so severe as to deprive a person of all means of earning a livelihood may amount to physical persecution." *Dunat v. Hurney*, 297 F.2d 744, 753 (3d Cir. 1961) (per curiam on reargument). As discussed in *Kovac v. INS*, *supra*, at 106-07, after deletion of the word physical from the description of persecution in former section 243(h) of the Act, the *Dunat* standard, deprivation of "all means of earning a livelihood," too narrowly defines economic persecution.

livelihood standard). Government sanctions that reduce an applicant to an impoverished existence may amount to persecution even if the victim retains the ability to afford the bare essentials of life. A particularly onerous fine, a large-scale confiscation of property, or a sweeping limitation of opportunities to continue to work in an established profession or business may amount to persecution even though the applicant could otherwise survive. Among these three examples, however, a compulsory change in occupation is least likely to qualify as persecution by itself. *See Matter of Acosta*, *supra*, at 234 (requiring the alien to change jobs to avoid a guerrilla threat).

A number of recent decisions provide guidance in assessing whether economic harm is sufficiently severe to amount to persecution. In *Guan Shan Liao v. U.S. Dep't of Justice*, *supra*, the Second Circuit determined that on the facts presented, the fine imposed for harboring a relative wanted for involuntary sterilization was insufficient to establish persecution. The court noted that "[n]o testimony or other evidence was presented regarding petitioner's income in China, his net worth at the time of the fines, or any other facts that would make it possible for us to evaluate his personal financial circumstances in relation to the fines." *Id.* at 70; *see also Yuan v. U.S. Dep't of Justice*, 416 F.3d 192, 198 (2d Cir. 2005) (holding that an alien who was fired as a result of his daughter-in-law's violation of a family planning law was not harmed to the level of persecution when there was "no evidence that he was barred from getting another position, or even that he looked").

The availability of other sources of income has been a key factor in assessing the impact of economic sanctions. In *Capric v. Ashcroft*, 355 F.3d 1075, 1092-93 (7th Cir. 2004), the court found that the alien's loss of a job and an apartment based on religion and ethnicity did not amount to past persecution where the government had given him 8 months to find a new residence, his wife had remained employed, he had not attempted to find other work, and the regional economic conditions in general were harsh. *See also Khourassany v. INS*, 208 F.3d 1096, 1101 (9th Cir. 2000) (finding that the forced closing of the applicant's restaurant did not rise to the level of harm constituting past persecution when he continued to operate other businesses); *Ubau-Marenco v. INS*, 67 F.3d 750, 755 (9th Cir. 1995) (concluding that confiscation of a family business without compensation because of the family's political beliefs may not be enough, standing alone, to support a finding of past persecution based on economic harm), *overruled on other grounds by Fisher v. INS*, 79 F.3d 955 (9th Cir. 1996).

Other decisions have found that various combinations of economic sanctions were sufficiently severe to constitute past persecution. For example, in *Li v. Attorney General of the U.S.*, *supra*, at 169, the Third Circuit concluded that "[i]n the aggregate, a fine of more than a year and a half's

salary; blacklisting from any government employment and from most other forms of legitimate employment; the loss of health benefits, school tuition, and food rations; and the confiscation of household furniture and appliances from a relatively poor family constitute deliberate imposition of severe economic disadvantage which could threaten [the] family's freedom if not their lives."

As discussed above, we endorse the test described in the 1978 House Report and quoted in *Matter of Laipenieks*, *supra*, in evaluating whether nonphysical forms of suffering or harm amount to persecution. Ultimately, each case must be considered on its own facts in making this assessment.

### D. Threat of Economic Sanctions Against the Respondent

We now turn to the question whether the economic sanctions in this case amounted to past persecution. As in *Guan Shan Liao v. U.S. Dep't of Justice*, *supra*, the record in the case before us contains scant information regarding the respondent's financial situation. It does not indicate whether the respondent and his spouse owned their own home, or if they lived in government housing or with the support of relatives. The record is unclear as to the amount of household income the respondent and his wife earned, how their income compared to that of other households in the region, and the minimum level of income required to provide a family of this size with food, shelter, and the other essentials of life. When asked whether, if his wife lost her job, the two of them could survive on his income, the responded answered somewhat indirectly: "Because, at that time, my only, my salary only 200 (indiscernible). Because she graduated from University, she make[s] more salary than me. Therefore, if she lost her job, it would be a big effect on our life." Although the respondent indicated at one point that his salary was "very low," he never clearly stated the amount of his or his wife's salary. The respondent's description of the economic consequences of the loss of his wife's salary was that he would have found it "hard to keep up with my living expenses" and that life would have been "difficult." Without clearer evidence of the difficulty the respondent and his family would have had in relying on the respondent's income, we cannot find that the respondent has described economic threats, which, if carried out, would amount to persecution.

We recognize that in finding that the totality of the pressures applied to the respondent's wife amounted to force within the meaning of the "refugee" definition, the Immigration Judge relied on a combination of factors, including the fear that the Chinese Government might refuse to register a second child and might seek to sterilize either the respondent or his wife. The immediate

coercive factor, however, appears to have been the threat of economic sanctions, principally the threatened loss of the respondent's wife's job.

The respondent testified that the potential loss of his wife's job was "the main reason" they submitted to the pressures to have the first abortion. The wife's written submission also referred to the loss of her job as the determinative factor in submitting to the abortions. It did not mention a threat of sterilization or any concern that a second child would not have been registered. Although the respondent described the prospect of sterilization and registration concerns as reasons why they did not plan to have a second child, the record is unclear whether an explicit threat of job loss or other adverse consequences were used to induce the respondent's wife to submit to the second abortion following the discovery of her unplanned pregnancy.

We will sustain this part of the DHS's appeal and, in large measure because the respondent prevailed below, we will remand the record to permit the parties to further address the question whether the respondent's spouse was subjected to a forced abortion. On remand, the parties may provide additional evidence regarding the respondent's salary, the family's living situation, and other factors relevant to whether the threatened economic harm in this case for refusal to undergo an abortion was such that they faced a "deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment or other essentials of life." *Matter of Laipenieks*, *supra*, at 457.

## E.  Discretionary Denial of Asylum

The respondent argues on appeal that the Immigration Judge erred in denying asylum in the exercise of discretion. Under 8 C.F.R. § 1208.16(e) (2006), when an alien is denied asylum solely in the exercise of discretion but is subsequently granted withholding of removal, the Immigration Judge must reconsider the denial of asylum to take into account factors relevant to family unification. In denying asylum in the exercise of discretion, the Immigration Judge relied on a number of adverse factors, but he failed to discuss or consider the impact of the denial on the respondent's ability to be reunited with his spouse and minor child. We will therefore sustain the respondent's appeal and remand the record to the Immigration Judge. If on remand the Immigration Judge determines that the respondent is eligible for withholding of removal, he should reconsider the discretionary denial of asylum, including whether there are "reasonable alternatives available to the applicant such as reunification with his . . . spouse [and] minor children in a third country." *Id.*

## IV.  CONCLUSION

We find no clear error in the Immigration Judge's determination that the testimony of the respondent was credible, and we will dismiss that part of the DHS's appeal.  However, we conclude that the evidence of record does not establish that the respondent's wife's abortions were "forced" as a result of the threat of economic sanctions so severe that, if carried out, they would amount to persecution.  We will therefore sustain that part of the DHS's appeal and remand the record for further proceedings in this regard.  Moreover, because the Immigration Judge failed to consider the impact of his discretionary denial of asylum on the respondent's ability to be reunited with his wife and minor child, the respondent's appeal will be sustained and the record will be remanded for such consideration.

**ORDER:**    The appeal of the Department of Homeland Security is sustained in part and dismissed in part.

**FURTHER ORDER:** The respondent's appeal is sustained.

**FURTHER ORDER:** The record is remanded to the Immigration Judge for further proceedings consistent with the foregoing opinion and for the entry of a new decision.

*DISSENTING OPINION*:  Patricia A. Cole, Board Member

I respectfully dissent.  I would affirm the Immigration Judge's findings that the respondent's wife's abortions were coerced within the meaning of the statute and congressional intent.  The majority concludes that the respondent's wife's abortions cannot be considered to have been forced within the meaning of section 101(a)(42) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42) (2000), unless the respondent shows that they were coerced by threats that, if carried out, would cause "severe economic disadvantage or the deprivation of liberty, food, housing, employment or other essentials of life." Specifically, the majority indicates that unless the respondent can demonstrate that his wife would have been subjected to threats of economic sanctions so severe that they would reach the level of harm for persecution, her submissions to the abortions would not be considered "coerced."  The majority's "severe economic deprivation" test misses the mark in focusing on whether the threatened harm for refusing an abortion, if carried out, would rise to a sufficient level of persecution, so severe that it would impact an applicant's essentials of life or freedom.

The respondent's wife did not want to abort her pregnancies, but she submitted to the procedures to avoid the threatened government-imposed sanctions.  She was indeed harmed.  Although the abortions may not have

been literally or physically "forced," they were certainly coerced because she submitted to the procedures in the face of government-imposed pressure. To refuse to recognize the submission to an abortion under such circumstances as "forced" is questionable to say the least. *See, e.g.*, *Huang v. Gonzales*, 453 F.3d 942, 947 n.2 (7th Cir. 2006) (recognizing the involuntary and coercive nature of a situation where an applicant submits to an abortion to conform to government policy); *Wang v. Ashcroft*, 341 F.3d 1015, 1020 (9th Cir. 2003) (finding that submitting to an abortion in the face of government-imposed pressure rises to the level of persecution under the Act); *see also* H.R. Rep. No. 108-792 (2004) (Conf. Rep.), 2004 WL 2968603 (stating that "in order to reduce reliance on abortion in developing nations, funds shall be available only to voluntary family planning projects" and describing voluntary projects, in part, as those that do not "deny any right or benefit, including the right of access to participate in any program of general welfare or the right of access to health care, as a consequence of any individual's decision not to accept family planning services").

Thus, like the Immigration Judge, in assessing the totality of the circumstances, I would find that the respondent's wife was forced to abort her pregnancies within the meaning of section 101(a)(42) of the Act. *See Lau May Sui v. Ashcroft*, 395 F.3d 863, 871 (8th Cir. 2005) (reading the phrase "forced to abort a pregnancy" in section 101(a)(42) of the Act to "require [the applicant] to show that Chinese officials used some sort of physical force or *undue pressure with the intent to cause, and which did cause, the particular abortion in question*" (emphasis added)); *Wang v. Ashcroft*, *supra*. Therefore, the respondent's wife has suffered past persecution within the meaning of the Act.