PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ROSEMARY MIRISAWO,

*Petitioner,*

v.

ERIC H. HOLDER, JR., Attorney General,

*Respondent.*

No. 08-1704

On Petition for Review of an Order of
the Board of Immigration Appeals.

Argued: December 1, 2009

Decided: March 17, 2010

Before NIEMEYER, GREGORY, and DAVIS,
Circuit Judges.

---

Petition denied by published opinion. Judge Niemeyer wrote
the opinion, in which Judge Davis joined. Judge Davis wrote
a separate concurring opinion. Judge Gregory wrote a sepa-
rate opinion concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED**: Virginia Leigh Hudson Nesbitt, MCGUIRE-
WOODS, LLP, Richmond, Virginia, for Petitioner. Paul
Thomas Cygnarowicz, UNITED STATES DEPARTMENT

OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Tony West, Assistant Attorney General, Civil Division, Daniel E. Goldman, Senior Litigation Counsel, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

## OPINION

NIEMEYER, Circuit Judge:

Rosemary Mirisawo, a native and citizen of Zimbabwe, filed this petition for review of the Board of Immigration Appeals' decision affirming an immigration judge's removal order, ordering her removed from the United States to Zimbabwe.

A few months before Mirisawo's G-5 visa was about to expire, she sought to forestall her removal from the United States by claiming asylum and withholding of removal under the Immigration and Nationality Act ("INA") and protection under the Convention Against Torture ("CAT"). She based her claims on past economic persecution because her house in Zimbabwe had been substantially destroyed by the government as part of Operation Restore Order and on a likelihood of future persecution because of the possibility that the political opinions of family members and those living in her neighborhood would be imputed to her.

The immigration judge and the Board of Immigration Appeals ("BIA") denied Mirisawo's claims, holding that the destruction of her house did not rise to the level of economic persecution and that the lack of recent persecution of any of her close family members suggested that Mirisawo would not herself be subjected to persecution upon her return to Zimbabwe. From the BIA's decision, she filed this petition for review.

Because we conclude that the BIA's conclusions are supported by substantial evidence, we deny Mirisawo's petition for review.

I

Rosemary Mirisawo was born in Harare, Zimbabwe, in 1966 and lived there until she came to the United States in 1999. She came to the United States on a nonimmigrant G-5 visa to work as a housekeeper, leaving her children with family members in Zimbabwe. Mirisawo has worked as a housekeeper, both in Zimbabwe and the United States, since she was 20 and, during this time, has lived in the homes of her employers. She has four children, as well as two brothers and eight sisters. The oldest of Mirisawo's children is a daughter named Tsitsi, who was born out of a rape by Mirisawo's uncle when Mirisawo was 14 years old. Since Tsitsi's birth, Mirisawo has been married twice. Her first marriage, which ended in divorce after two years, produced a daughter Mukhile. Her second marriage, which ended when her husband died in 1996, produced a son Teddy and a daughter Emily. All of her children now live with family members in Harare, Zimbabwe.

Mirisawo remained in the United States, employed as a housekeeper, until August 2002, when she returned to Zimbabwe for a month to visit family and to provide better accommodations for her children and brother, Tobias. A few months prior to her visit—in March 2002—Tobias had been severely beaten by supporters of the Zimbabwean government because he was an active member of the Movement for Democratic Change ("MDC"), a political party that opposed Robert Mugabe, the leader of the ZANU-PF party and the president of Zimbabwe for the last 29 years. Tobias was hospitalized following the beating and continues to receive medical treatment for his injuries. To avoid being associated with Tobias and his political activities during her visit, Mirisawo stayed with her sister Maggie. During her stay, she purchased a home in Mabvuku, a suburb of Harare, for Tobias and her children.

While in Zimbabwe during this visit, Mirisawo did not experience any difficulties with the government—she was not stopped, questioned, harassed, or beaten. When she returned to the United States, she was again admitted on a nonimmigrant G-5 domestic employee visa, which authorized her to remain in the United States until November 8, 2005.

In May 2005, the Mugabe government began implementing Operation Restore Order, pursuant to which it destroyed thousands of homes and buildings in Harare for the officially stated purpose of cleaning out urban slums. It was widely believed, however, that the operation was retributive, targeting areas known by the government to have voted for the opposition in presidential and parliamentary elections. In the course of Operation Restore Order, the government bulldozed three of the four rooms in the house that Mirisawo had purchased for Tobias and her children. Tobias and Mirisawo's son continued to live in the remaining room, while her other children went to live with Mirisawo's sister, Maggie.

According to the country report prepared by the United States Department of State in 2006, the human rights record of the Zimbabwean government was "very poor." The report noted that persons perceived to be opposition supporters were tortured, raped, and abused by government-sanctioned youth militia and ruling-party supporters and that the government "routinely used selective violence to achieve its political objectives."

Despite these conditions, Tobias, Mirisawo's daughter Tsitsi, and Mirisawo's sister Maggie continue to be members of the MDC. Since his beating in 2002, Tobias has not experienced any further threats or abuses. Tsitsi has never been harmed, but she was threatened into purchasing a ZANU-PF identification card. Maggie also has never been harmed or even threatened, although she keeps her membership in the MDC secret and does not live in the area of Harare where

Mirisawo claims the government presumes all residents to be MDC members.

On August 3, 2005, some three months before her G-5 visa was to expire, Mirisawo filed an application for asylum with the Department of Homeland Security ("DHS"). After her visa expired, however, the DHS served her with a notice to appear, charging her with removability pursuant to 8 U.S.C. § 1227(a)(1)(B) as an alien present in the United States in violation of law.

At the removal proceedings before an immigration judge, Mirisawo acknowledged that she was removable, but she claimed eligibility for asylum on the grounds that she had suffered past persecution in that her house was destroyed and that she was likely to suffer future persecution upon return to Zimbabwe because the political opinions of her family members and of persons in her neighborhood would be imputed to her.* Mirisawo also claimed that she was eligible for withholding of removal for the same reasons. Finally, she requested protection under CAT.

The immigration judge held that the destruction of Mirisawo's house did not amount to past persecution because Mirisawo had never lived in the house nor depended on it for her livelihood. The immigration judge also held that she was not likely to face future persecution because she had not been harassed upon her return to Zimbabwe in 2002 and because none of her family members who remained in Zimbabwe had been harmed since Tobias' beating in 2002. Because Mirisawo had not satisfied the lower standard for claiming asy-

---

*Neither party raised as an issue the fact that Mirisawo did not file her application for asylum within one year of her arrival in the United States, as required by 8 U.S.C. § 1158(a)(2)(B). Because she filed her application before the expiration of her nonimmigrant status, the immigration judge found that she met the "extraordinary circumstances exception" of 8 U.S.C. § 1158(a)(2)(D) and considered her application for asylum.

lum, the immigration judge held that she did not meet the higher standard for withholding of removal. Finally, the immigration judge dismissed Mirisawo's CAT claim, as she did not show that it was probable that the government would torture her "for any reason." Accordingly, by order dated October 24, 2006, the immigration judge ordered Mirisawo removed from the United States to Zimbabwe.

On appeal to the BIA, Mirisawo argued only her asylum and withholding of removal claims. By decision dated May 29, 2008, the BIA affirmed the immigration judge's determinations and order. Mirisawo filed this petition for review of the BIA's decision.

## II

The Attorney General is authorized to grant asylum to anyone who is a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42)(A). 8 U.S.C. § 1158(b)(1). A "refugee" is defined as a person who is "unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, [the person's home country] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The applicant for asylum bears the burden of establishing eligibility for asylum based on refugee status. 8 C.F.R. § 208.13(a); *Gonhasa v. INS*, 181 F.3d 538, 541 (4th Cir. 1999).

Accordingly, to establish eligibility for asylum, the applicant must demonstrate that she has suffered from past persecution or that she has a well-founded fear of future persecution. *See* 8 C.F.R. § 208.13(b); *Abdel-Rahman v. Gonzales*, 493 F.3d 444, 449 (4th Cir. 2007). And to establish a well-founded fear of future persecution, the applicant must demonstrate that "(1) a reasonable person in the circumstances would fear persecution; and (2) that the fear has some basis in the reality of the circumstances and is validated with

specific, concrete facts." *Huaman-Cornelio v. BIA*, 979 F.2d 995, 999 (4th Cir. 1992) (internal quotation marks omitted). "In other words, an asylum applicant must demonstrate a subjectively genuine and objectively reasonable fear of future persecution on account of a statutorily protected ground." *Abdel-Rahman*, 493 F.3d at 449.

While "persecution" is often manifested in physical violence, "the harm or suffering [amounting to persecution] need not be physical, but may take other forms," so long as the harm is of sufficient severity. H.R. Rep. No. 95-1452, at 5 (1978), *reprinted in* 1978 U.S.C.C.A.N. 4700, 4704. Among the forms of nonphysical harm amounting to persecution is that of "economic persecution," which includes the "deliberate deprivation of basic necessities" and the "deliberate imposition of severe economic disadvantage." *See In re T-Z-*, 24 I. & N. Dec. 163, 171 (BIA 2007). In both circumstances, however, the harm amounting to "economic persecution" must be so severe that it threatens the life or freedom of the applicant. *See Li v. Gonzales*, 405 F.3d 171, 177 (4th Cir. 2005) ("[E]conomic penalties 'rise to the level of persecution' only if such 'sanctions are sufficiently harsh to constitute a threat to life or freedom'" (quoting *Ahmed v. Ashcroft*, 396 F.3d 1011, 1014 (8th Cir. 2005))); *In re T-Z-*, 24 I. & N. Dec. at 171 ("[E]conomic persecution may involve the deliberate deprivation of basic necessities such that life or freedom is threatened"). Thus, to establish "economic persecution," an asylum applicant must demonstrate that, on account of one of the statutorily enumerated grounds, *see* 8 U.S.C. § 1101(a)(42)(A), the applicant's life or freedom has been threatened by either (1) a deliberate and severe deprivation of basic necessities or (2) a deliberate imposition of severe financial disadvantage. It is important to emphasize that not every economic deprivation or disadvantage makes a person a "refugee." Rather, it must be a deprivation or disadvantage so severe that it threatens the person's very life or liberty.

Relief in the form of withholding of removal, which also is based on persecution, "implicates a more demanding standard

of proof than the 'well-founded fear' standard applicable to asylum requests, in that a '[w]ithholding of removal is available only to an alien who can demonstrate a *clear probability* of persecution on account of his race, religion, nationality, membership in a social group, or political opinion.'" *Abdel-Rahman*, 493 F.3d at 449 (emphasis added) (quoting *Ngarurih v. Ashcroft*, 371 F.3d 182, 189 n.7 (4th Cir. 2004)). Thus, an applicant who fails to meet the lower standard for showing eligibility for asylum will be unable to satisfy the higher standard for showing withholding of removal. *Id.*

On a petition for review, the BIA's determination that an alien is not eligible for asylum or withholding of removal must be upheld unless it is "manifestly contrary to law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D). Moreover, the BIA's decision is deemed conclusive "if supported by reasonable, substantial and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (internal quotation marks omitted); *Abdel-Rahman*, 493 F.3d 448. We review legal issues de novo, *Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 278 (4th Cir. 2004), but we treat findings of fact "as conclusive unless the evidence before the BIA was such that any reasonable adjudicator would have been *compelled* to conclude to the contrary," *Haoua v. Gonzales*, 472 F.3d 227, 231 (4th Cir. 2007) (emphasis added) (citing 8 U.S.C. § 1252(b)(4)(B)).

### III

Mirisawo contends that she is eligible for asylum and withholding of removal because she suffered past economic persecution when the government destroyed her house during Operation Restore Order. She claims that the destruction of her house constituted economic persecution either because a house is a basic necessity for survival or because its destruction caused her to suffer severe financial disadvantage. She also argues that the BIA misunderstood the standard for showing economic persecution by conflating the two bases for

establishing it into one and requiring that both be shown to demonstrate economic persecution.

Addressing first the procedural issue raised by Mirisawo—that the BIA misapplied the standard for establishing economic persecution—we have reviewed the record and conclude that the BIA did not err in the way Mirisawo claims. Rather, the BIA's focus on the financial impact of the destruction of Mirisawo's house was due to the fact that Mirisawo's brief filed with the BIA relied primarily on this ground in arguing that she had suffered economic persecution.

With respect to Mirisawo's first substantive point on appeal — that the BIA erred in concluding that she had failed to demonstrate that the destruction of her house was a deliberate and severe deprivation of a basic necessity of life—we conclude that the BIA's judgment is supported by substantial evidence. At the time of the government's partial destruction of her house, Mirisawo had never lived in the house and was living and working in the United States as a live-in housekeeper. Nor is it likely that Mirisawo will ever need to live in the house, as she will likely continue to be employed as a live-in housekeeper if she returns to Zimbabwe. Mirisawo focuses on the facts that the property destroyed was a house and that the effect of Operation Restore was to deprive many Harare residents of the shelter necessary for their survival. But when evaluating the significance of the partial destruction of her house, we must focus not on the effect the government action had on the house itself or on others impacted by the government action, but on the effect the action had on *Mirisawo's* life and liberty. In this case, the record supports the conclusion that the destruction of Mirisawo's house in no way interfered with her ability to provide housing for herself, and therefore we cannot say that she was deprived of a basic necessity that threatened her "life or freedom." *See In re T–Z-*, 24 I. & N. Dec. at 171 ("In one sense, economic persecution may involve the deliberate deprivation of basic necessities such that life or freedom is threatened").

With respect to Mirisawo's contention that the destruction of her house was "the deliberate imposition of severe economic disadvantage," *see id.*, the BIA found that the destruction of Mirisawo's house did not impose sufficiently severe financial harm to constitute economic persecution, mainly because Mirisawo did not depend on her house for her livelihood. Mirisawo spent her career employed as a housekeeper, and the destruction of her house in no way interfered with her ability to continue in this type of employment. Moreover, she never attempted to live in the house nor expressed any intention to live there. While the partial destruction of her house undoubtedly resulted in an investment loss, Mirisawo did not rely on that investment for current or future income and did not, nor does not, need a return on that investment to continue working as a housekeeper and living as she has. In these circumstances, we cannot say that the BIA erred in concluding that the harm imposed was not sufficiently severe to constitute a threat to Mirisawo's life or freedom. *See id.* at 174 (noting that the "availability of other sources of income has been a key factor in assessing the impact of economic sanctions"); *Khourassany v. INS*, 208 F.3d 1096, 1101 (9th Cir. 2000) (finding support for the BIA's conclusion that the alien was not subject to past persecution when the government forced him to close one of his businesses because he was still able to operate other businesses); *Ubau-Marenco v. INS*, 67 F.3d 750, 755 (9th Cir. 1995) (same), *overruled on other grounds by Fisher v. INS*, 79 F.3d 955, 963 (9th Cir. 1996); *see also Li*, 405 F.3d at 178 (holding that a fine equivalent to more than one year's wages was not so severe as to compel a conclusion that it threatened the applicant's life or freedom).

In sum, the BIA's decision that Mirisawo did not suffer an economic deprivation sufficient to constitute past persecution is amply supported by the evidence. Certainly, we cannot conclude that an objective adjudicator would be *compelled* to disagree with the BIA's findings. *See* 8 U.S.C. § 1252(b)(4)(B).

IV

Mirisawo also contends that she has a well-founded fear of future persecution based on "a political opinion that may be imputed to her by virtue of her family ties or her status as an impoverished land-owner in Harare." She claims that the Zimbabwean government will believe that she is a member of the MDC because her brother Tobias, daughter Tsitsi, and sister Maggie are all members of the MDC and because it is widely believed that most of the residents of her neighborhood are members of the MDC.

While the BIA accepted Mirisawo's claim that she had a subjective fear of persecution, it rejected the notion that her fear was objectively reasonable. It reached its conclusion based in part on the fact that when Mirisawo returned to Zimbabwe in 2002, she faced no persecution of any type. It also noted that neither her oldest daughter nor her sister had ever suffered any persecution and that her brother Tobias, while having been beaten in 2002, has continued to live in Zimbabwe without further incident. We conclude that these facts provide substantial evidence to support the BIA's conclusion. The fact that family members whose political opinions Mirisawo fears will be imputed to her have not themselves faced harm fatally undermines her claim that she will suffer persecution because of her association with them. Moreover, the fact that she herself suffered no acts of persecution when she returned to Zimbabwe in 2002, shortly after her brother Tobias had been beaten, is highly probative.

For the foregoing reasons, we affirm the decision of the BIA and deny Mirisawo's petition for review.

*PETITION DENIED*

DAVIS, Circuit Judge, concurring:

I join the majority opinion in full and write briefly to amplify certain truths.

Of course, all members of the panel "are acutely aware that our job as a reviewing court is not to reweigh the evidence before the IJ." *Baharon v. Holder*, 588 F.3d 228, 233 (4th Cir. 2009) (Gregory, J.). Yet, our evaluation of the BIA's interpretation of the partial destruction of a house owned by Petitioner, under the applicable deferential standard of review, divides us, in part.[1] President Robert Mugabe's once promising tenure as the leader of Zimbabwe has been marred in recent years by election-rigging, arson, kidnappings, killings, and general violence against the opposition.[2] But the issue in this case is not whether Mugabe is an insufferable tyrant. We are not asked to determine the extent to which Zimbabweans suffer, generally, under his regime. The issue before us is whether the BIA abused its discretion in its assessment of whether a particular citizen of Zimbabwe— Petitioner Mirisawo— was able to show that she is "unable to or unwilling to return to . . . [her home] country because of persecution or a well-founded fear of persecution on account of . . . membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

In our effort to determine whether the BIA acted irrationally when it determined that Petitioner does not fit within the statutory definition of "refugee," we must assess whether the BIA grossly erred in determining that Petitioner had not suffered persecution in the past. *Abdel-Rahman*, 493 F.3d at 449 (citing 8 C.F.R. § 208.13(b)). The majority opinion correctly holds that economic penalties may constitute "persecution" where such "sanctions are sufficiently harsh to constitute a

---

[1] The partial dissent concurs in the holding that the BIA did not err or commit an abuse of discretion in affirming the IJ's finding that Petitioner failed to establish a reasonable fear of future persecution.

[2] *See* Eliot Tofa & Moses Tofa, *Zimbabwe and Mugabe's Politicization of State and Civic Institutions*, 13 GEO. PUB. POL'Y REV. 87 (2007-2008); *see also* Robert G. Meadow, *Political Violence and the Media*, 93 MARQ. L. REV. 231, 238 (2009); John Norris, *Getting It Right: What the United States Can Do to Prevent Genocide and Crimes Against Humanity in the Twenty-First Century*, 27 YALE L. & POL'Y REV. 417, 425 (2009).

threat to life or freedom." *Li*, 405 F.3d at 177. Here, it is clear that the BIA acted rationally when it concluded that Petitioner had failed to make such a showing.

In dissent, our good colleague reprises the argument that this circuit's substantive standard for determining the existence of "persecution" is too exacting. *See id.* at 180-84 (Gregory, J., dissenting). My view is that our standard fits comfortably within the mainstream of those standards applied by our sister circuits. *See, e.g., Zehatye v. Gonzalez*, 453 F.3d 1182, 1186 ("We have held that substantial economic deprivation *that constitutes a threat to life or freedom* can constitute persecution.") (emphasis added). Although the dissent seeks solace for its view in *Li v. Attorney General*, 400 F.3d 157, 168 (3rd Cir. 2005), the Third Circuit recently reaffirmed its standard in *Camara v. Attorney General*, 580 F.3d 196 (3rd Cir. 2009):

> In *Fatin v. I.N.S.,* we defined persecution as "threats to life, confinement, torture, and economic restrictions so severe that *they constitute a threat to life or freedom*." 12 F.3d 1233, 1240 (3d Cir. 1993). Importantly, "the concept of persecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." *Id.*

*Id.* at 202 (emphasis added). This standard tracks our own. No doubt, "unfair" and "unjust" are only mild descriptions of what the government did to Petitioner and her property in Zimbabwe. But, for the reasons fully explained in the majority opinion, the conclusion is inescapable that neither the IJ nor the BIA abused their discretion in finding and concluding that such "mistreatment [did not] sink[ ] to the level of persecution." *Baharon*, 588 F.3d at 232 (Gregory, J.) (alterations added).[3]

---

[3] To be sure, I share the dissent's manifest discomfort at our apparent powerlessness to right wrongs; we federal judges well know that this feel-

The dissent's allegation that the majority opinion rests on an "unwarranted[ ]" "assum[ption[ ]" that "Mirisawo was not planning on returning to the home she purchased," Dissenting Op. at 17, is itself warranted by nothing in the record or in the majority opinion itself. Determinations of where Mirisawo will live upon her return to Zimbabwe and what work she will do there were not and are not a part of the adjudication of this case at any level. Nor has any decision-maker in this case claimed knowledge of her intentions in these regards. Equally unwarranted is another of the dissent's seeming suggestions: the majority opinion *precludes as a matter of law* a future determination by an IJ or the BIA that an alien may support a claim of past persecution with proof of the destruction of a residence in which she never lived. The majority opinion does no such thing.

It is a *record* we assess here, not a hypothetical. The plain truth is that the BIA did not abuse its discretion, and we properly affirm its order. Accordingly, I join the majority opinion in its entirety.

---

ing of powerlessness is an occupational hazard with which we must live daily. The fact is, as the First Circuit has aptly noted:

> The Immigration and Nationality Act does not define persecu-tion, and we have said that the term "is a protean word, capable of many meanings." *Bocova v. Gonzáles*, 412 F.3d 257, 263 (1st Cir. 2005). *Generally, persecution is more than discrimination and rises above unpleasantness, harassment, and even basic suf-fering*.

*Kadri v. Mukasey*, 543 F.3d 16, 21 (1st Cir. 2008) (emphasis added). Thus, in this area of the law as in others, we encounter "discrimination . . . unpleasantness, harassment, and even basic suffering," *id*., which, in the absence of an abuse of discretion by other decision-makers, we are not authorized to remedy. So it is.

GREGORY, Circuit Judge, concurring in part and dissenting in part:

Petitioner Rosemary Mirisawo came to the United States in order to pursue a job; she had no illusions or desire that her residency here would become permanent. Rather, she accepted a G-5 visa and, for six years, worked as a household domestic in this country. In preparation for her eventual return to Zimbabwe, Mirisawo purchased a home in her native land. Her disabled brother and some of her children inhabited the house while she remained abroad. However, in 2005, the home, the only one she had ever owned, was destroyed by the Mugabe government in a show of force against the Movement for Democratic Change opposition. Therefore, now that Mirisawo's visa has not been renewed and she lacks status in this country, she has no shelter to which she may return. Given that destruction, Mirisawo has established past economic persecution and thus qualifies as a refugee for asylum purposes. For this reason, I dissent.*

I.

In order to be considered eligible for asylum under the Immigration and Nationality Act, a petitioner must show that he or she is a refugee, someone who, because of past persecution or a reasonable fear of future persecution, cannot return to his or her home country. 8 U.S.C. § 1101(a)(42)(A) (2006). In determining whether a petitioner is a refugee, we look both to the harm he or she has suffered in the past as well as the situation to which he or she will have to return if not granted asylum. Persecution is "not limited to physical harm or threats of physical harm and may include threats of economic harm, so long as the threats, if carried out, would be of sufficient severity that they amount to past persecution." *In re T-Z-*, 24 I. & N. Dec. 163, 169 (B.I.A. 2007). Economic persecution may qualify as past persecution if it constitutes either the "de-

---

*I concur with the majority that Mirisawo has not established a reasonable fear of future persecution.

liberate deprivation of basic necessities" or the "deliberate imposition of severe economic disadvantage." *Id.* at 171. Of the basic necessities of human life, shelter is certainly included. Along with food and water, housing is one of the components of fundamental human existence. Thus, its intentional deprivation constitutes past persecution. *Accord*, *Li v. Attorney General*, 400 F.3d 157, 168 (3d Cir. 2005) (holding economic persecution may involve "the deprivation of liberty, food, housing, employment, and other essentials of life" (citation and internal quotation marks omitted)).

The majority goes further, announcing for the first time that in this Circuit, for economic persecution to be shown, it must "be so severe that it threatens the life or freedom of the applicant," citing *Li v. Gonzalez*, 405 F.3d 171 (4th Cir. 2005), as support. Maj. Op. at 7. In *Li*, we held that "economic penalties 'rise to the level of persecution' only if such 'sanctions are sufficiently harsh to constitute a threat to life or freedom.'" 405 F.3d at 177 (quoting *Ahmed v. Ashcroft*, 396 F.3d 1011, 1012 (8th Cir. 2005); *see also Chen v. INS*, 195 F.3d 198, 204 (4th Cir. 1999) (mentioning that for economic harm to rise to the level of persecution, it must "at least" be substantial). The majority's standard for economic persecution goes beyond our prior holding in *Li* where we required that the economic harm "constitute a threat," not that the harm itself actually and currently threaten the individual's life or liberty. Maj. Op at 7-8. Further, the majority's requirement of a "severe" deprivation of basic necessities goes beyond any of our prior precedent which required only a "deliberate deprivation" of such essentials. Therefore, I find scant support for the majority's new standard under our precedent and, in any case, would not decide this issue because under either *Li* or the majority's standard, the destruction of Mirisawo's home constitutes past persecution.

In the majority's opinion, however, Mirisawo cannot claim the deprivation of her home simply because she never lived there in the past. *See* Maj. Op. at 9 ("At the time of the gov-

ernment's partial destruction of her house, Mirisawo had never lived in the house and was living and working in the United States as a live-in housekeeper."). Furthermore, in their view, because Mirisawo cannot demonstrate that she would ever work as anything other than a live-in maid, she cannot show that she would ever have lived in the house. *Id.* at 10 ("Mirisawo spent her career employed as a housekeeper, and the destruction of her house in no way interfered with her ability to continue in this type of employment."). In essence, for the majority, Mirisawo is considered a captive of her previous vocation and is unable to show that she has any other path open to her, even when there was no evidence that she would continue to work as a live-in maid were she to return to Zimbabwe. Indeed, the majority assumes that Mirisawo is satisfied with her condition and is in fact benefitted by it because she will presumptively have a roof over her head. *See Id.* at 9 ("In this case, the record supports the conclusion that the destruction of Mirisawo's house in no way interfered with her ability to provide housing for herself."). The majority thus concludes that Mirisawo suffered no past economic persecution because she did not depend on the home that she purchased for shelter, rental, or income.

## A.

There are two fundamental flaws in the majority's argument, one factual and one conceptual, both demonstrating that persecution was shown here. First, the majority unwarrantedly assumes that Mirisawo was not planning on returning to the home she purchased. Indeed, it assumes that Mirisawo was forever consigned to her role as a live-in domestic, continually inhabiting the homes and lives of other people, unable to forge her own way. *See* Maj. Op. at 9 ("Nor is it likely that Mirisawo will ever need to live in the house, as she will likely continue to be employed as a live-in housekeeper if she returns to Zimbabwe."). Yet, there is direct evidence in the record to the contrary showing that Mirisawo was actively preparing for her return home. First and foremost, the record

is completely devoid of evidence that Mirisawo had any intention, or indeed any desire, to remain in the United States permanently. This is not a case where a petitioner has applied for asylum merely because his or her application for permanent residency had been declined. Mirisawo never applied for any type of permanent status in the United States. In fact, in 2002, the first and only time that Mirisawo returned to Zimbabwe during her time living in the United States, she purchased a home. Further, there was no evidence presented that Mirisawo had any particular plans upon her return home to work as a domestic. At bottom, the majority's error is to assume that Mirisawo preferred to live in her employers' homes, when the evidence points to the fact that at the fist chance she had, she purchased a home of her own that would be available for her return.

### B.

The second flaw in the majority's argument is more conceptual. It is erroneous to conclude that as a matter of law an individual who has not lived in his home cannot make out a claim of economic persecution. The logical flaw of the majority's opinion is quite clear in the following example. Imagine an alien in the United States who has secured a temporary work visa and who has no interest or reason to seek permanent resident status. As that person prepares to return home, he contacts a friend in his home country and asks him to dig a well at his house. In return, the alien will send him $1,000 via Western Union. The friend agrees, and within two weeks, the well is completed and the money transferred. Unfortunately, before the alien returns home, agents of the government come to his house and pour poison in his well, suspecting that he sympathizes with the opposition party, supporters of which live in his neighborhood. In response, the alien files an asylum claim in the United States, claiming past economic persecution which deprives him of the necessities of life: water. Confronted with that case, would this Court hold that merely because the alien had yet to drink from the

well, he was not persecuted? That result is counter to logic and counter to law.

So too here the majority's decision is without basis in law or reason. Mirisawo was able to buy the house with her earnings in the United States. Like so many temporary workers, she used the money she earned abroad to provide for her future at home. Unfortunately Mirisawo was never able to enjoy the fruits of her labors because the house was bulldozed before she inhabited it. Yet, merely from her inability to occupy the house, how can we assume that Mirisawo never intended to live there in the first place? Fundamentally, it is without support in the law to hold that the destruction of the most significant investment a person has ever purchased, which is also a necessity of life, does not constitute persecution.

## II.

The majority opinion evinces some knowledge of a maid's life, but betrays no understanding of her dream. I must dissent.